## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Max Farhad,

      Plaintiff,                        Case No.

v.                                  Hon.
                                    United States District Judge

General Motors, LLC,
a Delaware Corporation,           Hon.
                                    United States Magistrate Judge

      Defendant.

---

PITT, MCGEHEE, PALMER,
BONANNI & RIVERS P.C
Michael L. Pitt (P24429)
Bayan M. Jaber (P85451)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
bjaber@pittlawpc.com

---

## PLAINTIFF'S COMPLAINT FOR DAMAGES AND
## EQUITABLE RELIEF

Plaintiff, Max Farhad ("Farhad") by and through his counsel, Pitt McGehee Palmer Bonanni & Rivers, brings this action against General Motors, LLC, ("GM") for wrongful discharge in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 623, *et seq.*, and the Elliot Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 *et seq.*, and states as follows:

## INTRODUCTION

In August 2024, GM announced in an email to its salaried employees that the Company was restructuring its performance evaluation system into a "forced ranking"[1] system with five new evaluation categories: 1) Significantly Exceeds Expectations, 2) Exceeds Expectations, 3) Achieves Expectations, 4) Partially Meets Expectations, and 5) Does Not Meet Expectations.

As part of the new plan, GM organizational managers were expected to rate 5% of their team as Significantly Exceeds Expectations, 10% as Exceeds Expectations, 70% Achieves Expectations, 10% Partially Meets Expectations, and 5% Does Not Meet Expectations. Employees rated "Does Not Meet Expectations" became eligible for immediate separation, by-passing past procedure of placing low-performing employees on Performance Improvement Plans ("PIP") or other progressive disciplined designed to improve performance.

By requiring managers to rate 5% of their business unit at the lowest category, thereby skirting progressive discipline practices such as warnings or PIPs, GM had,

---

[1] Forced ranking is a performance management system where employees are compared and ranked against each other, with a fixed percentage placed into specific performance categories, such as top, middle, and bottom performers.  Forced ranking systems may lead to biased decision-making and discrimination.  Employees at Microsoft, Ford, and Conoco have filed lawsuits against their employers, saying that forced ranking systems are inherently unfair" because they favor some groups of employees over others: white males over blacks and women, **younger managers over older ones** and foreign citizens over Americans." Abelson, Reed (19 March 2001). "Companies Turn to Grades, And Employees Go to Court". *New York Times*. https://www.nytimes.com/2001/03/19/business/companies-turn-to-grades-and-employees-go-to-court.htm   . Retrieved April 9, 2025. (emphasis added)

by year end 2024, terminated hundreds of long-term salaried employees all under the guise of manufactured performance deficiencies in what has been described by many as "rank and yank."[2]

On June 16, 2025, 40-year GM veteran, Plaintiff Max Farhad, age 66, fell victim to this "rank and yank" employment practice when he was suddenly terminated. At the time of his termination, GM did not provide Farhad with his year-end performance evaluation, nor was he given any opportunity to demonstrate improvement through a performance improvement plan or any other progressive disciplinary method that would otherwise have resulted in his continued employment with the Company.

## JURISDICTION, VENUE, PARTIES, AND EXHAUSTION

1.     This Court has subject matter jurisdiction over this case and controversy pursuant to 28 U.S.C. § 1331, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 623, et seq.

2.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims brought under the Michigan Elliott-Larsen Civil Rights Act, MCL §

---

[2] "General Motors (GM) has begun implementing significant workforce changes through its newly introduced performance review system, which reportedly identifies the bottom 5% of performers for immediate termination…. As of January 2025, employees have started sharing experiences on various platforms indicating that "appropriate action" indeed means immediate termination for those in the bottom 5%. Multiple reports describe separations happening without warning or improvement plans, suggesting this system serves as a streamlined approach to workforce reduction.".     "General Motors' 2025 Layoffs: Silent Cuts and Severance Expectations" https://fired.fyi/blog/gm-layoffs-2025. Retrieved April 9, 2025.

37. 2101et seq., because all of Plaintiff's claims arise from the same facts and form the same case or controversy.

3.     Plaintiff Max Farhad is a resident of West Bloomfield, Michigan.

4.     Defendant General Motors is a Delaware Limited Liability Corporation with its world headquarters in Detroit, Michigan.

5.     Venue is established in this District Court because the parties reside in and/or regularly conduct business throughout the Eastern District of Michigan, and because the events giving rise to these claims occurred in the Eastern District of Michigan.

6.     On July 23, 2025, Farhad filed with the EEOC a charge of age discrimination pursuant to the ADEA.  On August 11, 2025, the EEOC issued its Right-To-Sue Letter.  This lawsuit has been timely filed within 90 days of Farhad's receipt of the Right-To-Sue Letter.

## STATEMENT OF FACTS

### Summary of Farhad's Successful 40 Year Career with GM

7.     Farhad, age 66, began his employment with GM on April 22, 1985, and worked continuously in various salaried engineering positions for more than 40 years when he was terminated without notice or warning on June 16, 2025.

8.     From 2016 until his termination on June 16, 2025, Farhad's title was Virtual Performance Integration Manager, assigned to the full-size truck architecture

4

(including all Chevrolet and GMC light-duty pickup trucks) and full-size Sport Utility Vehicles for Chevrolet Tahoe and Suburban, GMC Yukon and Cadillac Escalade.

9.      From 1997 to 2016, Farhad worked as a Vehicle Dynamics Engineering Group manager.

10.     From 1985 to 1996, Farhad held various engineering positions working on Structural Durability, Noise & Vibration, Safety/Crash and Vehicle Dynamics.

11.      Farhad holds a Bachelor of Science in Mechanical Engineering from Wayne State University in Detroit, Michigan.  In 1985, he earned a Master's Degree from Wayne State University. In 2006, he received a Master's in Business Administration from the University of Indiana.  He is a registered Professional Engineer licensed by the State of Michigan.  Farhad has earned credits towards his PhD degree in Mechanical Engineering.

12.     From July 2024 until the time of termination on June 16, 2024, Farhad reported to Brandon Bloss ("Bloss"), Senior Engineering Manager-Virtual Performance Integration.

13.     Bloss reports to Jason Fischer ("Fischer"), Executive Director - Vehicle Design and Virtual Integration.

14.     Before Bloss, Farhad reported to Jonathan Ridgway ("Ridgway"), Senior Manager, Global Advanced Performance, Virtual Integration and Benchmarking, beginning in 2018.

15.     During his 40-year Career with GM, Farhad excelled in his performance and demonstrated consistent loyalty to the Company earning numerous promotions and pay/benefits increases.

16.     In 2023, his total compensation from GM was $207,2449 and in 2024, his total compensation from GM was $212,412.

17.     In addition to regular promotions and pay increases, Farhad received special recognition for his outstanding work.

18.     For example, on April 22, 2025, Joseph Furnari, Chassis Tech Lead, praised Farhad, stating:

> I would like to thank Max for all his leadership and contributions on a challenging effort to integrate a body on frame mount that improves durability and has better performance than the former mount. Max's collaboration, open team effort, and willingness to coach the team was instrumental. Max coached the team and help others learn on the how to compare loads and sensitivity in the most efficient manner possible. Max also helped others learn how to present to the Chief to avoid confusion. Thank you Max!

19.     On May 30, 2025, Gjovan Gojcaj, Accessory Engineering Lead wrote:

> I want to acknowledge and express my appreciation to Max and his exceptional commitment to go the extra step to discuss his T1-SUV 24" TWA VDDV Report from 2021, on his day-off! His effort to clarify complex aspects and share historical context not only saved

significant time but also ensured that I fully understood the key insights and nuances of the report. Thank you!!

20.     On June 13, 2025, a mere three days before Farhad's termination for alleged performance issues, Erick Gowen, Engineering Manager complemented Farhad, stating:

> Thank you Max for purposely assembling a diverse set of stakeholders to discuss 2030 T1-2 weld optimization. I know that you did a lot of prep curating and talking with folks to ensure a productive and open dialogue with diverse specialties and opinions.

21.     On June 16, 2025, (Farhad's termination date) Farhad was in the process of successfully completing a complex tactical planning (who, what, when, and how) to address a corporate goal of reducing the number of spot-welds on GM's next generation of full-size truck SUV vehicles.

22.     Farhad was very proud to have obtained the agreement of all major stakeholders in support of the plan, with significant potential to save GM millions of dollars in production costs on GM's next generation of full-size truck SUV vehicles (currently dominating the market with 70% market share, the highest of any product in GM's portfolio, and with the highest profit margin).

23.     At 3:00pm on Monday, June 16th, Farhad joined a regularly (every Monday) scheduled 1-on-1 remote video call with Bloss.  As the meeting began, Farhad noted an additional participant, from the department Human Resources. Farhad was shocked to learn that instead of the routine 30-minute discussion

concerning project progress (a staple of manager and direct reports working relationships), the meeting was used to notify him of his termination because of unsatisfactory performance in behaviors (One-team and Be-Inclusive) as alleged against him in his 2024 year-end review by Bloss months earlier on February 5, 2025.

**GM's Performance Evaluation System is Corrupt
and Discriminatory Toward Older Employees**

24.   In August 2024, GM announced in an email and memorandum ("August 2024 Memo") to its salaried employees that it was restructuring its performance evaluation system into a "forced ranking"[3] system with five new evaluation categories:   1) Significantly exceeds expectations, 2) Exceeds Expectations, 3) Achieves Expectations, 4) Partially Meets Expectations, and 5) Does Not Meet Expectations.

25.   As part of the new plan, GM advised its workforce that it expects each organization's manager to rate 5% of their team as significantly exceeds expectations, 10% as exceeds expectations, 70% achieves expectations, 10%

---

[3] Forced ranking is a performance management system where employees are compared and ranked against each other, with a fixed percentage placed into specific performance categories, such as top, middle, and bottom performers.  Forced ranking systems may lead to biased decision-making and discrimination.  Employees at Microsoft, Ford, and Conoco have filed lawsuits against their employers, saying that forced ranking systems are inherently unfair" because they favor some groups of employees over others: white males over blacks and women, younger managers over older ones and foreign citizens over Americans." Abelson, Reed (19 March 2001). "Companies Turn to Grades, And Employees Go to Court". *New York Times*. https://www.nytimes.com/2001/03/19/business/companies-turn-to-grades-and-employees-go-to-court.htm   . Retrieved April 9, 2025.

partially meets expectations and 5% who do not meet expectations. Employees rated as "Does Not Meet Expectations" were now eligible for immediate separation, by-passing past practices of placing low performing employees on performance improvement plans or other programs designed to improve performance.

26.     The final ratings were determinative of each employee's "Target Bonus Payout."[4]

27.     By requiring managers to rate 5% of the workforce in its business unit in the lowest category, and by-passing past practices such as warnings or performance improvement plans, GM, by year-end 2024, terminated hundreds of long-term salaried employees on the basis of manufactured performance deficiencies in what was described by many as "rank and yank."[5]

---

[4] GM's "Performance Management Updates: August 2024" states:
"We expect every organization to have the following distribution. Also included below are the TeamGM bonus payout targets, aligned to the ratings. This will allow us to recognize those making exceptional business impacts, and effectively manage those failing to drive our business objectives forward:
- Significantly Exceeds Expectations: 5% of the organization (150% target bonus payout)
- Exceeds Expectations: 10% of the organization (125% target bonus payout)
- Achieves Expectations: 70% of the organization (100% target bonus payout)
- Partially Meets Expectations: 10% (50% target bonus payout)
- Does Not Meet Expectations: 5% (0% target bonus payout)"
[5] "General Motors (GM) has begun implementing significant workforce changes through its newly introduced performance review system, which reportedly identifies the bottom 5% of performers for immediate termination…. As of January 2025, employees have started sharing experiences on various platforms indicating that "appropriate action" indeed means immediate termination for those in the bottom 5%. Multiple reports describe separations happening without warning or improvement plans, suggesting this system serves as a streamlined approach to workforce reduction.". https://fired.fyi/blog/gm-layoffs-2025.

28.     A central feature of GM's performance management program is the so-called "Calibration Sessions."  The employee's manager provides a preliminary rating.  This preliminary rating is followed by a Calibration Session whereby Group Leaders review dozens, and in some cases hundreds, of preliminary evaluations.

29.     According to the August 2024 Memo, "GM will continue to use ARC to calibrate performance at year-end (absolute, relative and context).  These factors will be considered for employees and their peer groups to assign a year-end rating."

30.     It is during these Calibration Sessions that corruption and age discrimination takes place.  For the most part, the discretion of the Group Leaders in allocating ratings is unfettered.[6]

31.     It is well documented in numerous court cases and other reliable sources of information that this lack of restraint results in the alteration of the preliminary evaluations and a discriminatory ranking of the employees for purposes of allocating limited bonus money, merit increases, promotions and separations.

---

[6] Bloss shared with Farhad an example of the corrupt practices inherent in the Calibration Sessions. At a regularly scheduled Wednesday staff meetings (led by Bloss and attended by Farhad and eight other VPIM team members), Bloss discussed the forced ranking of employees that was used by General Electric when he was an employee there.  He noted that at GE, to prevent the system from terminating valuable employees by being ranked more than once below expectation and thus leading to automatic termination, the department managers had an under-table agreement to rotate employees through such ranking only once so that the quota could be met, but the valuable employees would be saved from the HR mandated practice.

32.     The ranking results in a disproportionate number of younger employees receiving favorable treatment while a disproportionate number of older employees receive unfavorable treatment.

33.     GM's use of the Calibration Session breeds corruption. Because management is *required* rate a percentage as "Does Not Meet Expectations," satisfactory performers, including employees with decades of solid performance and contributions, are falsely characterized as unsatisfactory performers so that management can meet its "quota."

34.     Since the adoption of this new approach, scores of long-term employees have been falsely characterized as unsatisfactory performers and denied their earned bonus allotments or separated without being given a second chance through use of Performance Improvement Plans or other traditional methods of improving the performance of long-term employees.

### Farhad Was Adversely Impacted by this Discriminatory and Corrupt Performance Management System

35.     Farhad received a favorable 2024 Mid-Yer Review from Ridgway who had been his direct leader for several years.

36.     Bloss replaced Ridgway in August 2024.

37.     Farhad's 2024 Year-End-Review ("YER") was conducted by Bloss on February 5, 2025.

38.    Bloss characterized Farhad, who had almost 40 years of dedicated service to GM, as an unsatisfactory employee because of his "behaviors." [7]  The two unsatisfactory behaviors were identified by Bloss as "one-team" and "inclusivity."

39.    Farhad disagreed with Bloss's assessment and asked for the evidence used to support this erroneous conclusion.

40.    Bloss cited two examples.

41.    In example one, Farhad met with his team on May 10, 2024, to review progress on an assignment. When Farhad noticed that the work was marked as

---

[7] The performance management system requires an employee to evaluated on his performance and behaviors.  These behaviors are outlined as follows:

1. **Win with Integrity**: Employees are expected to act honestly, respectfully, and transparently, never compromising on safety. 2. **Commit to Customers**: This involves understanding and anticipating customer needs to design high-quality, affordable products and experiences that delight them. 3. **Innovate and Embrace Change**: Employees are encouraged to be curious, explore new ideas, act on new possibilities, and adapt to succeed in a rapidly changing environment. 4**. Speak Fearlessly**: This emphasizes the importance of respectfully challenging each other and providing feedback based on facts, promoting open debate and constructive progress. 5. **Move with Urgency**: Employees are expected to move quickly and thoughtfully to capitalize on opportunities, focusing on what matters most. 6**. Be Inclusive**: GM values diverse views and encourages open dialogue to foster an environment where everyone feels they belong and can contribute their best thinking. 7. **Lead as One Team:** This focuses on effective collaboration, providing clarity and context, empowering and supporting each other, and succeeding together. 8. **Own the Outcome**: Employees are accountable for their individual actions and performance, as well as those of their teams. This includes tackling problems, taking responsibility, and making tough decisions to ensure the best outcomes for the enterprise.

These behaviors are evaluated using a five-point rating system, ranging from "Significantly exceeds expectations" to "Does not meet expectations". This system replaced a previous three-point scale to provide more granular differentiation in performance and to better reward high performers. Performance rankings are tied to employee bonuses, with top performers potentially receiving significantly higher payouts.

"incomplete," he asked the presenting engineer (Puttana Patel) two questions: 1) Why the work was not yet completed roughly 18 months into the project with multiple gate reviews with the same incomplete marking, and 2) what particular deliverable(s) was not yet completed. The presenting engineer's manager (Amy Luebke) stepped in and lied, stating the work was all complete but was marked down as "incomplete" in error.  Farhad asked the employee to correct the record to show the work was "completed" and send the presentation to Farhad, to be saved as required in the program repository, as the required protocol after each gate review. The presenting engineer complied and forwarded the report to Farhad, which he then saved to the program repository.  This exchange between Farhad, Patel and Luebke was used by Bloss as evidence of Max's berating Patel and Luebke and failing to demonstrate "One-Team" behavior, as noted in his 2024 year-end review (February 5, 2025). Later in the year (in September of 2024) a Body-Closures Design team lead reached out to Farhad (the platform VPIM) and reported of finding evidence that the vehicle under development (GM's next generation full-size light-duty pickup trucks) was susceptible to hood-flutter under highway driving conditions. That proved the May 10, 2024, report-out of the incomplete work as noted by Patel, specifically related to hood flutter, and the manager's lie about work having been completed.  Farhad led an effort to design a latch reinforcement in the months following (October of 2024 through January of 2025).  This reinforcement cost the

company over $9 million in tooling a new part and for the piece-cost, because of lateness of the finding and while constructing proto-type vehicles with production tools/dyes.[8]

42.    There were many witnesses to this exchange and Farhad asked Bloss to interview these witnesses to verify that he was not "talking down to or berating" anyone during or after the May 10, 2024, meeting.

43.    The second example cited by Bloss involved a meeting held in October of 2024. At that meeting, Farhad challenged assertions made by a Mr. Seenivasan ("Seenivasan") that additional load analysis was unnecessary for the Extended Cab vehicle configurations vehicle that Mr. Farhad also had responsibility for within the GM's Next Generation Light Duty Pickup program.  Farhad needed the work done for the program chief and other stakeholders to understand what factors were driving proposed design changes for the Cab and Box of the vehicles under consideration as compared to existing generation of the truck currently in production.  The discussion was respectful; however, Mr. Seenivasan was unwilling to support the work, citing

---

[8] On February 6, 2025, Farhad was recognized by Alberto Gonzalez-Olague (Body Closure Lead Design Release Engineer) and his Director (Marcia Ganske) for demonstrating *"One-Team"* behavior related to above accomplishment:

> *I would like to recognize all the support you provided during the T1-2 LD ZR2 Hood Lift Issue.  Your technical knowledge and ability to remove roadblocks was instrumental to keep the work group on task, complete all the necessary studies and get technical context to arrive at the best solution available to take to the program team for approval.*
> *Thank you, Max*

other obligations, which Farhad, as Architectural VPIM, would have known if true. The truth was that Mr. Seenivasan wished to conceal design changes that would be required of his colleagues who were body engineers under the direction of Amy Luebke. It appeared to Farhad that Seenivasan did not want to exhibit any behavior contrary to Luebke and her team's design change recommendations.  However, Farhad, as the program VPIM, and Scott Garver as the program Chief Engineer, did not have any engineering evidence to justify spending millions of additional dollars to revise the structures on a variant which was very similar in relevant factors to the existing models (six years in production without any warranty or recall history).

44.     This exchange with Seenivasan was then characterized by Bloss as evidence of Farhad not showing "Inclusive" behavior!

45.     Farhad informed Bloss that there were witnesses, including the platform Program Assistant Chief Engineer, Ben Kelly ("Kelly") who would support his contention that nothing improper happened in his communications with Seenivasan.  Farhad reached out to Kelly and described the situation.  Kelly was surprised and thanked Farhad for his exemplary contributions to the program and stated that he would be delighted to verify the respectful exchange of the discussions cited above with anyone and anytime.

46.     As a result of these erroneous conclusions about Farhad's behaviors, Farhad received a "Partially Meets Expectations" rating from Bloss.

**Farhad Protested the False Unsatisfactory Behavior Assessment**

47.     On February 28, 2025, Farhad met with Jason Fischer ("Fischer"), the Head of his Department. Farhad presented Fischer with a detailed written rebuttal. Fischer reviewed the material and listened to Farhad's arguments.  He did not override Bloss's erroneous conclusions or ask Human Resources to interview the proffered witnesses to see if they would corroborate Farhad's account of these two incidents.  Instead, he suggested that Farhad appeal his evaluation to Aware Line, an organization retained by GM to hear salaried employee grievances.

48.     In March 2025, Farhad filed an appeal with Aware Line and submitted detailed rebuttals to Bloss's erroneous conclusions.

49.     In May 2025, Aware Line informed Farhad that its "investigation" was complete.  Aware Line refused to share with Farhad the results of its investigation.

50.     Melissa Schrader of GM Human Resources ("Schrader") confirmed that Aware Line had completed its investigation.  Schrader would not disclose the results of the investigation.   When Farhad pressed Schrader for more information, she said, "even if there were some wrongdoings toward you, your 2024 YER would not change, and that it was plausible that a letter would be filed in the personnel file of the wrongdoers, but that was all in theory."

51.     After receiving the "Partially Meets" evaluation for 2024, Bloss met with Farhad on a weekly basis.   Bloss insisted that Farhad identify personal behavior

goals related to "One-Team" and "Be-Inclusive" behaviors with employees "you think you have problems with."

52.     Farhad informed Bloss that he did not have problems with any employees.   He asked Bloss to identify the employees he supposedly had problems with and Bloss refused to identify any such employee.

53.     Farhad struggled with Bloss' nonsense.  He added new "goals" to his efforts, all of which were rejected by Bloss out of hand.

54.     Frustrated by the "Alice in Wonderland" nature of his interactions with Bloss, Farhad asked Bloss to have a Human Resources representative attend these sessions so that he/she could hear Bloss' demands, his tone and overall conduct.

55.     Bloss reacted to Farhad's request for Human Resources assistance by stating: "Are you threatening me?"

56.     In Late May and early June 2025, Bloss included Schrader in his meeting with Farhad. Farhad pointed out that he just received additional Recognitions for his good work.  Bloss was unimpressed.

57.     Schrader suggested training on "collaboration" and Farhad successfully completed the training.

58.     On June 16, 2025, Farhad was brought into a video meeting and Bloss read a prepared statement.  "Since you had not defined a personal and measurable

goal proving your "One-Team" or "Being Inclusive" behaviors, your employment with GM is terminated immediately."

59.     Farhad's computer access was promptly cut off, he was instructed to return his Company car, laptop, corporate phone, ID badge.

### COUNT I
### VIOLATION OF ADEA AND ECLRA
### AGE DISCRIMINATION - DISPARATE TREATMENT

60.     Plaintiffs incorporate by reference all the allegations contained above, as though stated in full herein.

61.     At all times relevant to this action, Defendant GM was an employer within the meaning of the ADEA and ELCRA.

62.     Under the ADEA and ELCRA, GM is prohibited from limiting, segregating, or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition, or privilege of employment, because of the individual's age.

63.     In violation of the statutory duties set forth in the ADEA and the ECLRA, GM designed and implemented a performance management system for its salaried workforce for the purpose of targeting for termination its older employees

so that it could promote younger employees into positions held by older and more senior personnel.

64.    Farhad was selected for termination because of his age, as demonstrated in part by the fact that GM retained significantly younger employees in positions that Farhad was better qualified to perform.

65.    Moreover, GM treated younger employees more favorably than Farhad in the process of deciding which employees would be selected for separation as a function of the performance management system requiring 5% "Does Not Meet Expectations" ratings.

66.    Furthermore, adverse employment actions taken because of age are unlawful regardless of whether they are based on explicit and conscious age bias, or on implicit and unconscious age bias.

67.    GM has a duty as an employer to refrain from discrimination based on age, including taking steps to ensure that the process of selecting employees for separation in the organizational restructuring action/reduction-in-force was not influenced by conscious age bias, or by implicit and unconscious age bias.

68.    GM encouraged the influence of conscious and unconscious age bias in the selection process because it knew that its force ranking performance management system was empirically known to discriminate, and because it knew

that its selection processes lacked the structured, objective criteria that prevents implicit bias forms of discrimination.

69.     As a direct result of these unlawful employment practices, Farhad has and will continue to experience economic losses in salary, incentive compensation and bonuses, fringe benefits, promotional opportunities, and a loss of earning capacity caused by the stigma of being terminated from his position with GM; Farhad has and will continue to experience non-economic losses including loss of reputation, humiliation, embarrassment, mental anguish and emotional distress.

70.     Accordingly, Farhad requests the following relief from this Court:

a.     An order of this Court declaring that GM violated ADEA and ECLRA's prohibition against age discrimination when it terminated his employment.

b.     An order of this Court awarding Farhad all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages available under the ADEA and ELCRA, past and future, resulting from the discriminatory treatment described in this Complaint.

c.     An order of liquidated damages for GM's willful violation of the ADEA.

d.      An order of this Court reinstating Farhad to employment with GM in positions comparable to those which they held at the time they were terminated.

e.      An order of this Court awarding interest, costs and attorney fees; and

f.      An order of this Court awarding such other relief as this Court deems just and equitable.

**COUNT II**
**VIOLATION OF THE ADEA AND ELCRA**
**AGE DISCRIMINATION – DISPARATE IMPACT**

71.    Plaintiff incorporates by reference all the allegations contained above.

72.    In August 2024, GM announced in an email to its salaried employees that it was restructuring its performance evaluation system with five new evaluation categories:  Significantly Exceeds Expectations, Exceeds Expectations, Achieves Expectations, Partially Meets Expectations, and Does Not Meet Expectations.

73.    As part of the new plan, GM advised Organizational Managers to rate 5% of their team as Significantly Exceeds Expectations,10% as Exceeds Expectations, 70% Achieves Expectations, 10% Partially Meets Expectations and 5% Does Not Meet Expectations.

74.    The disparate adverse impact upon older workers caused by the practices used by GM in its forced ranking performance management system cannot be justified as necessary to GM's business.

75.     As a direct result of the age-based disparate impact, Farhad has suffered an adverse employment action in the form of his termination and will continue to suffer all the injuries and damages as set forth above.

76.     Accordingly, Farhad requests the following relief from this Court:

a.     An order of this Court declaring that GM's forced ranking performance management system violates the ADEA and ADEA and enjoining the further application of those policies and practices.

b.     An order of this Court awarding Farhad all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages as available under the ADEA and ELCRA, past and future, resulting from the discriminatory treatment described in this Complaint.

c.     An order of liquidated damages for its willful violation of the ADEA.

d.     An order of this Court reinstating Farhad to employment with GM in a position comparable to that which he held at the time he was terminated.

e.     An order of this Court awarding interest, costs and attorney fees; and

f.     An order of this Court awarding such other relief as this Court deems just and equitable.

Respectfully submitted,

PITT, MCGEHEE, PALMER,
BONANNI & RIVERS P.C

BY: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Bayan M. Jaber (P85451)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
bjaber@pittlawpc.com

Dated: September 3, 2025

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Max Farhad,

     Plaintiff,               Case No.

v.

                                   Hon.
General Motors, LLC,         United States District Judge
a Delaware Corporation,

                                   Hon.
     Defendant.         United States Magistrate Judge

PITT, MCGEHEE, PALMER,
BONANNI & RIVERS P.C
Michael L. Pitt (P24429)
Bayan M. Jaber (P85451)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
bjaber@pittlawpc.com

**JURY DEMAND**

    Plaintiff, Max Farhad, by and through his attorneys, hereby demands a trial by jury on all matters so triable.

                PITT MCGEHEE PALMER BONANNI & RIVERS
                    By: /s/Michael L. Pitt
                    Bayan M. Jaber (P85451)
                    Michael L. Pitt (P24429)
                    Attorneys for Plaintiff
                    117 W. Fourth St, Suite 200
                    Royal Oak, MI 48067
                    mpitt@pittlawpc.com
Dated: September 3, 2025      248.398.9800